## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **MAXWELL D. KOZLOV and BENJAMIN D.** | : | |
| **BOSIS, individually and on behalf of other** | : | |
| **similarly situated individuals,** | : | |
| **Plaintiffs,** | : | **Collective Action** |
| | : | |
| **v.** | : | **C.A. NO.: 2019** |
| | : | |
| **BROWN UNIVERSITY IN PROVIDENCE IN** | : | |
| **THE STATE OF RHODE ISLAND AND** | : | |
| **PROVIDENCE PLANTATIONS, alias,** | : | |
| **Defendant** | : | |

## COMPLAINT

## I.    Introduction

1.      This is an action brought by Plaintiffs Maxwell D. Kozlov and Benjamin D. Bosis (collectively referred to herein as "Plaintiffs") against their current and former employer, Defendant Brown University in Providence in the State of Rhode Island and Providence Plantations, seeking compensatory, liquidated, and punitive damages, counsel fees, costs and other equitable relief arising out of violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* and the Rhode Island Payment of Wages Act ("RIPWA"), R.I. Gen. Laws § 28-12-1, *et seq.* and § 28-14-1, *et. seq*.

2.      With respect to the claims brought under the FLSA, this action is brought pursuant to the opt-in collective action provisions of the FLSA, 29 U.S.C. § 216(b).

3.      Additionally, and in the alternative, with respect to the FLSA and RIPWA claims, Plaintiffs bring this action as a multi-party action, separate and apart from the opt-in collective action claims set forth herein.

## II.    Parties

4.    Plaintiff Maxwell D. Kozlov ("Plaintiff Kozlov") is a resident of the City of Providence, County of Providence, and State of Rhode Island, and at all times relevant to this action was an employee—within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA and R.I. Gen. Laws § 28-12-2(5) and § 28-14-1(2) of the RIPWA—employed by the Defendant in the State of Rhode Island.

5.    Plaintiff Benjamin D. Bosis ("Plaintiff Bosis") is a resident of the City of Providence, County of Providence, and State of Rhode Island, and at all times relevant to this action was an employee—within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA and R.I. Gen. Laws § 28-12-2(5) and § 28-14-1(2) of the RIPWA—employed by the Defendant in the State of Rhode Island.

6.    Defendant Brown University in Providence in the State of Rhode Island and Providence Plantations, *alias* ("Defendant") is a non-profit corporation duly organized and incorporated under the laws of the state of Rhode Island, with a principal office located at 1 Prospect Street, Providence, RI 02912.

## III.    Jurisdiction

7.    The United States District Court for the District of Rhode Island has federal subject matter jurisdiction over this case under the provisions of 28 U.S.C. § 1331 because Plaintiffs assert claims arising under federal law; specifically, the FLSA, 29 U.S.C. § 201, *et seq.* Supplemental jurisdiction over the state law claims set forth herein is predicated on 28 U.S.C. § 1367 as they arise out of the same case or controversy.

## IV.    Venue

8.    Venue is proper in this Court insofar as Defendant is doing business in Rhode Island and therefore is deemed to reside in the District of Rhode Island, in compliance with the

requirements set forth in 28 U.S.C. § 1391. Moreover, a substantial part of the acts and/or omissions giving rise to the claims asserted herein occurred in the District of Rhode Island.

## V. **Material Facts**

### A. **FLSA Liability Allegations**

9. At all relevant times, Defendant was Plaintiffs' employer within the meaning of 29 U.S.C. § 203(d) of the FLSA and R.I. Gen. Laws § 28-12-2(6) and § 28-14-1(3) of the RIPWA.

10. Defendant is, and at all relevant times was, engaged in related activities performed through unified operation or common control for a common business purpose, and is, and at all times hereinafter mentioned was, an enterprise within the meaning of 29 U.S.C. § 203(r).

11. At all relevant times, Defendant, on a regular, consistent and recurrent basis, as part of the Defendant's regular course of business of providing services and distributing product in interstate commerce, employed workers in the activities of said enterprise engaged in commerce or in the production of goods for commerce, including handling, selling or otherwise working on goods or materials that have been moved in or produced in commerce.

12. At all relevant times, Defendant's enterprise has had an annual gross volume of sales made or business done in the amount of not less than $500,000.00.

13. At all times relevant to this action, Defendant was an institution of higher learning within the meaning of 29 U.S.C. §§ 203(r) and (s).

14. Accordingly, additionally, by statutory definition, Defendant is, and at all relevant times was, an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 203(s)(1)(A) and/or (B).

**B.      FLSA Collective Action Allegations**

15.      Plaintiffs bring this action on behalf of themselves and all other similarly situated

current and former employees ("Class Plaintiffs") of Defendant, who were and/or are affected by

the actions, pay schemes, policies, and procedures of Defendant as described herein.

16.      In addition, Plaintiffs bring this action in their individual capacities, separate and

apart from the collective action claims set forth herein.

17.      **The FLSA collective action class** is defined as follows:

> All individuals employed by the Defendant as either Student Unit
> Managers and/or Assistant Managers and/or Student Unit Supervisors in the
> Cashiers, Carts, or Blue Room Units (or other comparable positions) for Brown
> University Dining Services ("Brown Dining Services") and subject to the
> following common practices and/or policies of Defendant at any time from three
> (3) years before the filing of this Complaint to the present:
>
> a.      Who were scheduled or required to be "on call" for work; and,
> b.      Who were not paid at least minimum wage for each hour they
> worked and/or were scheduled or required to be "on call" for work; and,
> c.      Who worked more than forty (40) hours in a week, including but
> not limited to "on call" hours; and,
> d.      Were not paid at least one and one-half (1 ½) times their regular
> rate of pay for all hours worked in excess of forty (40) in a week, including but
> not limited to "on call" hours; or,
> e.      Who were just subject to the payment practices described in
> subparagraphs "a" and "b" above.

18.      Plaintiffs are similarly situated with other Student Unit Managers or Assistant

Managers ("Managers") and Student Unit Supervisors ("Supervisors") or other comparable

positions employed by Defendant in the Cashiers, Carts, or Blue Room Units in that they were

all subject to the same payroll practices, policies and procedures of Defendant, performed similar

work under similar working conditions, and were subject to the same unlawful practices alleged

in this Complaint and sustained the same or similar damages as a result.

19.      Plaintiffs and Class Plaintiffs reserve the right to amend said class definition

consistent with information obtained through discovery.

**C.**     **Allegations Common to Plaintiffs and All Class Plaintiffs: Brown Dining Services Organization and Operation and Student Manager Responsibilities**

20.     At all relevant times, Plaintiffs and Class Plaintiffs worked for Defendant as either Student Unit Managers or Assistant Managers or Student Unit Supervisors in the Cashiers, Carts, or Blue Room Units (or other comparable positions) for Brown Dining Services.

21.     Brown Dining Services is the name of the department or division of the Defendant responsible for operating Defendant's two all-you-can-eat dining halls, four eateries, four satellite cafés, two campus markets, a bakery, a faculty dining club, and an extensive catering service.

22.     At all relevant times, Plaintiffs and Class Plaintiffs were full-time students enrolled in and matriculating at the Defendant.

23.     At any one time, Defendant employed three Unit Managers, one each in the Cashiers, Carts, and Blue Room Units, and one Assistant Unit Manager in the Blue Room.

24.     The Blue Room Unit has an Assistant Manager to assist the Manager of the unit, who performs essentially all the duties of a Manager except is in charge of a different section of the Blue Room Unit subject to oversight of the Manager.

25.     Plaintiffs and Class Plaintiffs were responsible for, in collaboration with and subordinate to non-student professional staff, training, supervising, scheduling, managing, and disciplining, approximately 200 student "line workers" employed by Brown Dining Services and for making sure the dining units in which they worked ran smoothly, effectively, and were properly staffed.

26.     As part of the above responsibilities of Plaintiffs and Class Plaintiffs, two Supervisors and a Manager were required to be "on call" for all periods in which a Unit was in operation.

27. Supervisors were scheduled for an on call shift of two (2) to three (3) hours and a Unit Manager was always considered on call during Unit operating hours, unless on approved time off.

28. The line workers, supervised, scheduled, and managed by Plaintiff and Class Plaintiffs, performed work as cashiers, bussed tables, washed dishes, cooked, prepared food, and/or performed such other routine labor for Brown Dining Services.

29. Line workers self-scheduled themselves to work regular shifts of 2-3 hours via an online scheduling system.

30. Frequently, line workers subsequently become unavailable, unable, or unwilling to work a scheduled shift for any number of reasons, including a sudden class schedule change, studying for an examination, fatigue, illness, injury, mistake, or numerous other unforeseen reasons.

31. Accordingly, Plaintiffs and Class Plaintiffs were required to schedule themselves as "on call" for all scheduled line worker shifts.

32. Plaintiffs and Class Plaintiffs were also required to schedule themselves for any shifts for which no line workers were self-scheduled.

33. When Plaintiffs and Class Plaintiffs scheduled themselves for unfilled shifts they did so as "back up."

34. When a line worker with whom Plaintiff and Class Plaintiffs had experience as being unreliable was scheduled for a shift, Plaintiff and Class Plaintiff would sometimes schedule themselves as "back up."

35. In the event a shift was still unfilled when it was due to commence or when an unreliable worker did indeed call out or no-show, the Plaintiff or Class Plaintiff who had scheduled themselves as "back up" was required to work.

36.     In the event a "back up" shift was subsequently filled by a line worker, the Supervisor would become merely "on call" for that shift.

37.     As a matter of custom or practice, although "no showing" for a shift would generally result in discipline, line workers could sometimes "no show" for many shifts before discipline resulted in their termination.

38.     As a matter of custom or practice, line workers generally may call out for a scheduled shift without discipline.

39.     This is particularly true during "Critical Periods," which for scheduling purposes are the approximately two week periods each semester between the start of the Academic Reading Period and the end of Final Examinations.

40.     As a matter of policy, during Critical Periods, with advance notice, a line-worker could miss any shift without adverse employment action.

**D.     Allegations Common to Plaintiffs and All Class Plaintiffs: On Call Duties and Compensation Scheme**

41.     At all relevant times, Managers and Supervisors were not paid a guaranteed "salary" but were instead paid hourly, and therefore were not exempt employees because the respective "salary" basis tests applicable under the FLSA and the RIPWA were not met.

42.     Additionally, when called into or otherwise required to report to the work site for work while "on call," Managers and Supervisors were not compensated for a minimum shift pay of three hours, contrary to state law and Defendant's own policy.  R.I. Gen. Laws § 28-12-3.2 ("An employer who requests or permits any employee to report for duty . . . and does not furnish at least three (3) hours work on that shift, shall pay the employee not less than three (3) times the regular hourly rate."); Brown University Administrative Polices §40.030 ("If non-exempt employees are called in to work, they must be paid for a minimum of three hours or the actual hours worked, whichever is greater.").

**Page 7 of 29**

43.     At all relevant times, during numerous workweeks, the hours of physical work performed by Managers and Supervisors in combination with their uncompensated "on call" time exceeded forty (40) hours, however, they were never paid over time compensation at time and one-half for all hours worked in excess of forty (40) in those workweeks.

44.     When "on call," Plaintiffs and Class Plaintiffs were not paid at all unless they swiped in at a swipe station located at Brown Dining Services or requested pay for "unswiped" time on their biweekly time sheets.

45.     Defendant regularly reminded Plaintiffs and Class Plaintiffs to minimize submissions of "unswiped" time on timesheets and actively discouraged requests for compensation for "unswiped" time from Plaintiffs or Class Plaintiffs.

46.     Specifically, Defendants displayed, general hostility toward "unswiped" time submissions on Plaintiffs and/or Class Plaintiffs time sheets, challenged "unswiped" time submissions made by Plaintiffs or Class Plaintiffs, instructed Plaintiffs or Class Plaintiffs not to request compensation for "unswiped" time on time sheets, and threatened adverse employment actions for "excessive" "unswiped" time, and directed Plaintiffs and Class Plaintiffs to physically go to a swipe station while resolving issues if they wanted to be paid.

47.     While "on call," Plaintiffs or Class Plaintiffs were required, by policy, practice, and circumstance, to remain on Defendant's campus during all "on call".

48.     Indeed, Plaintiffs or Class Plaintiffs, while "on-call, were required to immediately physically report to their unit to fill open shifts or address a problem that required them to be at a Unit.

49.     Further, as a matter of custom, policy, practicality, and Health Code regulation, Plaintiffs or Class Plaintiffs while "on-call" were required to be on campus, with their

manager/supervisor card, and in dress code, which included closed toed shoes, long pants, and a shirt with sleeves, no matter the season or time of year.

50. Despite this compensation system, Defendant required Plaintiffs and Class Plaintiffs to attend to many, time-consuming work tasks, which often required immediate attention and were performed away from locations where Plaintiffs or Class Plaintiffs could swipe and record their time.

51. For example, while "on call," Plaintiffs and Class Plaintiffs were required to answer phone calls from line workers, non-student managers, and other Managers and Supervisors, and immediately respond to and resolve whatever issue was presented.

52. Also, while "on call," Plaintiffs and Class Plaintiffs were required to respond to text messages from line workers, non-student managers, and other Managers and Supervisors, immediately and to respond to and resolve whatever issue was presented.

53. Further, Plaintiffs and Class Plaintiffs were required to actively engage with a group text communication application call "GroupMe" and respond to messages from non-student managers, and other Managers and Supervisors, immediately when "on call," and promptly even when not "on call."

54. Additionally, while "on call," Plaintiffs and Class Plaintiffs were required to respond to emails from line workers, non-student managers, and other Managers and Supervisors, immediately and to respond to and resolve whatever issue was presented.

55. Responding to these communications and resolving whatever issues were presented was entirely uncompensated except for some limited "unswiped" time, the time when a Manager or Supervisor was required to actually physically report to a Unit, and then only the time physically spent at the Unit, and the rare time when a Manager or Supervisor happened to already be at a Unit and could swipe in while doing this work.

### E.  Supervisors

56.    Supervisors, in conjunction with Unit Managers and non-student managerial staff, were responsible for recruiting, training and overseeing, line workers.

57.    Supervisors, in conjunction with Unit Managers, were also responsible for ensuring that all shifts are covered.

58.    The Units in question in this case generally employed approximately eight (8) and ten (10) Supervisors at any given time.

59.    At any one time, Defendant employed approximately twenty-four (24) to thirty (30) Supervisors in the Cashiers, Carts, and Blue Room Units.

60.    Supervisors had to schedule themselves to be "on call" during the period that the Unit at which they are employed is in operation and to collectively ensure that all hours of operation were cover with appropriate "on call" Supervisors.

61.    These "on call" shifts normally ranged from two (2) to three (3) hours each and Supervisors divided them up to cover the operational hours of the Unit at which they were employed.

62.    When "on call," Supervisors were required to remain on and not to leave Defendant's campus.

63.    When "on call," Supervisors" were required to be in dress code, which included closed toed shoes, long pants, and a shirt with sleeves, no matter the season or time of year.

64.    When "on call," Supervisors were required to answer and respond to phone calls regarding issues arising at the Unit immediately.

65.    These issues vary, but most often involve line-workers calling out and/or no-showing for their shifts, issues with the register and/or point of sale software ("PoS"),

discrepancies in the amount of cash in the draw and the amount recorded by the PoS, and conflicts between line-workers.

66.     During an "on call" shift of two (2) to (3) hours, Supervisors normally would receive up to five (5) phone calls, involving issues which typically took between fifteen (15) minutes and one (1) hour to resolve and often requiring the Supervisor to open their computer and review a number of spreadsheets, make additional phone calls, send text messages, emails, and messages to the group communication application "GroupMe," and/or physically report to the Unit to resolve issues.

67.     During an "on call" shift of two (2) to (3) hours, Supervisors typically would take part in up to five (5) text message conversations, each taking about fifteen (15) minutes to one (1) hour to resolve, and typically dealing with the same issues as set forth in paragraph 66 above.

68.     During an "on call" shift of two (2) to (3) hours, Supervisors would typically spend about thirty (30) minutes to one (1) hour sending and receiving messages on the group communication application "GroupMe," typically dealing with the same issues as set forth in paragraph 66 above and/or general communications and/or management of the Unit.

69.     In the aggregate, during a normal two (2) to three (3) hour "on call" shift, when a Supervisor was not required to actually cover the line worker shift, they would typically spend between about thirty percent (30%) and seventy percent (70%) of the "on call" time actively answering communications, making calls, sending messages, and otherwise doing work and completing tasks to ensure the smooth operation of the Unit.

70.     Further, during about sixty percent (60%) of "on call" shifts, Supervisors would have to be physically present at the Unit at least once to resolve an issue and would typically have to cover at least some part of a line-worker shift about forty (40%) of the time.

71.     Typically, a Supervisor is scheduled to be "on call" between approximately 10-35 hours per week.

72.     Typically, a Supervisor performs between approximately 15 to 40 hours of compensated work weekly attending scheduled meetings with other supervisors, training, recruiting, and overseeing line workers (by on-site visits or "check-ins"), handling a matter or issue by phone, and filling "on call" "back up" or "no show" line worker shifts.

73.     The above estimate of compensated work does not include uncompensated work done while "on call" either when a Supervisor did not swipe in at a swipe machine or during the period of time a Supervisor was dealing with an issue while "on call" before they physically reported to a Unit except for a small amount of compensated "unswiped" which was typically limited by Defendant to a few hours per biweekly pay period.

74.     Supervisors had essentially no ability to "trade off" their "on call" time, due to their limited number as well as the inability to efficiently notify line workers of the switch, as a consequence of which they would be contacted regardless of any change.

75.      The latter is true because "on call" schedules were posted across campus for line workers on a weekly basis and were not and could not be changed until the following week's schedule was posted.

76.     Accordingly, Supervisors could not effectively swap "on call" shifts because line workers had already been directed to call a particular Supervisor and would do so regardless of any effort to swap an "on call" shift on the part of Supervisors.

77.     As such, Supervisors did not "trade off" their "on call" time.

78.     Supervisors typically logged more scheduled "on call" hours and worked more line worker shifts during Critical Periods due to more frequent "call outs" and "no shows."

79.     For example, due to the nature of the Cashiers Unit, during Critical Periods, Supervisors in that unit were typically scheduled to be on-call between approximately 50-72 hours per week.

80.     Not surprisingly, during Critical Periods, Supervisors would receive even more phone calls, texts, and GroupMe messages than normal.

81.     During Critical Periods, Supervisors would typically spend between about fifty percent (50%) and one-hundred percent (100%) of "on call" shift time actively doing work.

82.     Supervisors were not compensated for any of the above work unless they were physically present at the Unit and swiped themselves in, or they requested pay via "unswiped" time which, as a matter of practice and policy, was limited by Defendant to a few hours during each biweekly pay period.

83.     At all relevant times, Supervisors were compensated biweekly on an hourly basis anywhere between $12.45 per hour and $10.10 per hour.

### F.     Managers

84.     Managers, in conjunction with Supervisors and non-student managerial staff, were responsible for recruiting, training and overseeing, line workers.

85.     Managers, in conjunction with non-student managerial staff, were also responsible for recruiting, training and overseeing Supervisors.

86.     Managers recruited, oversaw, and evaluated a team of Supervisors and scheduled and attended at least two weekly meetings, one with their team and another with other Managers to ensure all shifts were covered, the units were fully staffed, staffing levels were maximized and efficiently deployed, and to develop and disseminate uniform policies and standards.

87.     Managers, in conjunction with Supervisors, are also responsible for ensuring that all shifts are covered.

88.     Managers are also required to schedule themselves to fill any open Supervisor "on call" hours which are not covered and to be the line-worker of last resort if the "on call" Supervisors are unable or unavailable to work an open shift or is already filling in on a shift.

89.     Further, Managers are required to be "on call" in their managerial capacity during the entire period of time during which their unit is in operation each day, to check in on their Unit on at least a daily basis and maintain a regular presence, including late-nights and weekends in applicable Units, and if they must be away arrange back up coverage and notify non-student managers, their supervisors, and other relevant parties.

90.     As part of their "on call" responsibilities, Managers would, on a normal day, typically send between about twenty (20) and one-hundred (100) messages on GroupMe, and receive between fifty (50) and three-hundred (300) message on GroupMe, dealing with shifts for which line workers called out or no-showed and dealing with other scheduling issues and spent about thirty (30) minutes to three (3) hours a day communicating on GroupMe and resolving the issues related to those communications.

91.     As part of their "on call" responsibilities, Managers would, on a normal day, typically receive about seven (7) emails and send about five (5) emails relating to people notifying management that they would be out, other administrative work such as correcting hours, resolving other scheduling issues, composing and sending digests of issues, changes, policies, and updates related to the Unit the Manager oversaw, communicating with student staffing office about line worker and Supervisor availability, investigating issues which might require discipline and filling out discipline forms for student workers, resolving scheduling requests, and working on scheduling software.

92.     Depending on the problem or issue, each email sent or received typically required about three (3) minutes to forty (40) minutes, with most taking about twenty (20) to thirty (30) minutes to resolve matter.

93.     Managers were expected to act on emails expeditiously—more or less promptly depending on the subject matter.

94.     As part of their "on call" responsibilities, Managers would, on a normal day, typically receive, up to six (6) phone calls per day, with an average of two (2) or three (3) phone calls a day relating to no-show issues with line workers, typically requiring about fifteen (15) minutes to one (1) hour to resolve; technical issues with registers, PoS and cash discrepancies, generally requiring the Manager to physically attend to the Unit themselves or find another managerial employee to do so, typically taking about fifteen (15) to forty-five (45) minutes to resolve; resolving disputes between line workers related to work and scheduling, typically taking about thirty (30) to forty-five (45) minutes to resolve; and calls from non-student staff related to payroll and/or scheduling, typically requiring about thirty (30) minutes to resolve.

95.     As such, Managers typically spend about one (1) hour to one and one half (1 ½) hours answering phone calls and resolving issues related to those calls during any given day and sometimes spent as much as about four (4) or five (5) hours doing so.

96.     Managers were expected to answer the phone at all times while their Unit was in operation and to resolve the issue immediately.

97.     As part of their "on call" responsibilities, Managers would, on a normal day, typically receive up to fifteen (15) text messages about distinct issues mostly from line workers and generally relating to scheduling, no shows, disputes between line workers, and problems with registers, PoS, and cash discrepancies, and typically spend about thirty (30) minutes to one and one half (1 ½) hours a day responding to and resolving those issues.

98.     In order to address these issues  and respond properly to emails, GroupMe, phone calls, and text messages Managers generally had to consult and revise spreadsheets, consult policy manuals and handbooks, use scheduling software, and communicate with others via email, text, and phone calls with many of these tasks requiring the use of their computer.

99.     As such, as a practical matter, Managers had to have their phone and computer with them at all times their Unit was in operation, which composed the majority of any given day.

100.     As Managers are listed on the "on call" sheet posted in their Unit it was impossible to "trade off" "on call" time because line workers would simply call the number listed at all times the Unit was in operation if there was an issue.

101.     As a practical matter, Managers had to be on Defendant Campus at all times while "on call" in order to effectively and properly carry out their responsibilities.

102.     This was the case except in the unusual event of an unavoidable personal obligation or emergency or the rare case where there were no existing or anticipated problems, all shifts were filled, and additional Supervisors were willing, able, and available and could assume management functions while the Manager was off campus.

103.     Managers typically spent between about thirty (30%) and fifty (50%) of the operational hours of their unit on any given day doing work that was part of their "on call" responsibilities.

104.     During Critical Periods, Managers could expect to receive even more phone calls, texts, and GroupMe messages than normal.

105.     During Critical Periods Managers could expect to spend between about forty percent (40%) and eighty (80%) of "on call" shift time actively doing work.

106.    Managers were not compensated for any of the above work unless they were physically present at the Unit and swiped themselves in, or they requested pay via "unswiped" time which, as a matter of practice and policy, was limited by Defendant to a few hours during each biweekly pay period.

107.    Even when swiped in, the time spent before arriving at the Unit, communicating about the problem, trying to resolve the issue remotely and getting to the Unit, was uncompensated.

108.    At all relevant times, Managers were compensated biweekly on an hourly basis at a rate of $11.70 to $14.35 per hour.

**G.    Allegations Common to Plaintiffs and All Class Plaintiffs: Restrictions on Activities**

109.    Managers and Supervisors, while "on-call," were typically unable to engage in any activities off campus, including attending social, athletic, theatrical, political, family, and/ or other events or functions, shopping, visiting family or friends, see a movie, or even eating dinner out at a restaurant.

110.    As such, Managers were totally unable and Supervisors were substantially less able then normal students or student workers to move to less expensive off campus housing, particularly housing located somewhat farther away from campus, and thus had no or limited access to better and cheaper housing stock.

111.    Even on campus activities were limited, including the ability of Managers and Supervisors to study, participate in study groups or group projects, or attend certain campus functions or to work-out or engage in any other physical exertion that would require them to shower and change.

112.    Indeed Managers and Supervisors would routinely have to leave class, study sessions, the library, and other activities to answer and make phone calls, to rush to Units physically to resolve problems or cover shifts, and to otherwise respond to communications.

113.    In addition, the sleep patterns of Managers and Supervisors were interrupted and adversely affected, due to the inability to maintain a normal sleep cycle routine by the uncertainty and actually handling of "on call" obligations, particularly during Critical Periods.

114.    For example, in the Carts Units, the last on-call shift ended at 2 a.m. and the first one began the next morning at 7 a.m., leaving only five (5) hours of time without pressing potential communications.

115.    At all relevant times, the obligations of Managers and Supervisors to respond on account of "on call" obligations were both frequent and immediate as outlined above.

116.    At all relevant times, Managers and Supervisors were subject to discipline for failure to comply with their extensive "on call" obligations under the foregoing scheme.

117.    At all relevant times, Managers and Supervisors, were effectively required to report to a Brown Dining Services site with a swipe machine in order to be compensated for work done while "on call" creating a situation where Managers and Supervisors would either have to report to a Brown Dining Services site with a swipe machine at least once or twice every few hours in order to be paid, or to not be paid at all except for highly limited "unswiped" time typically limited by Defendant to a few hours every biweekly pay period.

118.    At all relevant times, the extensive "on call" obligations of Managers and Supervisors under the foregoing scheme were imposed by and for the benefit of the Defendant in order to permit Defendant to exploit a large, readily available and cheap, but not particularly reliable, line worker student work force that was on or near the site of its work locations.

119.    At all relevant times, "on call" time imposed such a burden on Managers and Supervisors that Defendant's policy required that they be paid for such time.  Brown University Administrative Polices §40.030 ("When non-exempt employees are on-call and are required to remain on Brown's premises, they are considered to be working and must be compensated for this time.").

### H.    Allegations Specific to Plaintiff Kozlov

120.    Plaintiff Kozlov was employed by Defendant between on or about September of 2016 and September 22, 2018 as either a Manager or Supervisor.

121.    Plaintiff Kozlov was a Supervisor in the Cashiers Unit between on or about September of 2016 and May of 2017, a Manager in the Cashier Unit between May of 2017 and June of 2018, and a Manager in the Carts Unit between May of 2018 and September 22, 2018.

122.    During the forgoing period, Plaintiff Kozlov was either scheduled or required to work "on call" anywhere between about 30 and 112 hours per week.

123.    During the forgoing period, Plaintiff Kozlov was required to perform all the work outlined above as either a Supervisor or Manager, depending on his role at the time.

124.    During the forgoing period, Plaintiff Kozlov was not compensated for any "on call" work or time unless he was physically present at a Unit and swiped himself in, and then only for time he actually spent in the Unit, or when requested pay for "unswiped" time which was, as a matter of practice and policy, typically limited by Defendant to a few hours during each biweekly pay period.

125.    During the forgoing period, Plaintiff Kozlov typically spent between about thirty (30%) and eighty (80%) of the operational hours of their unit on any given day doing work that was part of their "on call" responsibilities, a large portion of which was uncompensated time.

126.    During the forgoing period, Plaintiff Kozlov was often reminded that he was not to request pay for more than a limited amount of "unswiped" time and would be disciplined if he requested too much "unswiped" time or did so too frequently.

127.    Indeed one of his Kozlov's non-student supervisors informed him via email that "I noticed that you have numerous unswiped time notations on your time sheet for the last pay period. Please note that unswiped hours should be kept to a minimum and only occur when you can't get somewhere with a time clock and the work absolutely can not wait.  Doing work at night in your dorm room/apartment should not become routine.  If you can, you should try to plan to do that work in a unit somewhere that has a time clock. Or try to plan to do the work earlier in the day."

128.    However, the requirement that he promptly attend to communications while "on call" coupled with the frequency of communications he received "on call" meant that this compensation scheme suggested by his non-student supervisors would either have required Kozlov to typically report to a swipe machine at least a dozen times a day and spend much of every day at a Brown Dining Services worksite, or to be entirely uncompensated for the vast majority of work he did while "on call."

129.    Further, at all relevant times, during numerous workweeks, Plaintiff Kozlov was called into work to cover or complete a line-worker shift and was not paid for a minimum of three hours on each occasion.

130.    At all relevant times, during numerous workweeks, Plaintiff Kozlov's hours performing compensated work in combination with his uncompensated "on call" work and time exceeded 40 hours, however, he was never paid overtime compensation at time and one-half for all hours worked in excess of 40 in any of these workweeks.

131.    For instance, during the week of Sunday, September 10, 2017 to Saturday, September 16, 2017, in the capacity of Manager of the Cashiers Unit, Plaintiff Kozlov worked on site and was compensated for 31.5 hours; however, the Unit was in operation from 10:30 a.m. until 2:15 a.m each and every day.  Accordingly he was "on call" for 15.75 hours each and every day or a total of 110.25 "on call" hours for the week.  After taking into account physical work he was called in to perform on call and was paid for that week, Plaintiff Kozlov was "on call" and uncompensated for 78.75 hours that week including 70.25 hours of overtime compensation.

## I.    Allegations Specific to Plaintiff Bosis

132.    Plaintiff Bosis was employed by Defendant between on or about October of 2016 and September 16, 2018 as a Supervisor in the Cashier Unit.

133.    During the forgoing period, Plaintiff Bosis was either scheduled to work "on call" anywhere between 12 and 24 hours per week.

134.    During the forgoing period Plaintiff Bosis was expected to perform all the duties of a Supervisor as outlined above.

135.    During the forgoing period Plaintiff Bosis was not compensated for any "on call" work or time unless he was physically present at a Unit and swiped himself in, and then only for time he actually spent in the Unit, or he requested pay via "unswiped" time which was, as a matter of practice and policy, typically limited by Defendant to two (2) or three (3) hours during each biweekly pay period.

136.    During the forgoing period Plaintif Bosis was often reminded that he was not to request pay for more than a limited amount of "unswiped" time and would be disciplined if he requested too much "unswiped" time or did so too frequently.

137.    At all relevant times, during numerous workweeks, Plaintiff Bosis was called into work to cover or complete a line-worker shift and was not paid for a minimum of three hours on each occasion.

138.    At all relevant times, during numerous workweeks, Plaintiff Bosis's hours performing compensated work in combination with his uncompensated "on call" work and time exceeded 40 hours, however, he was never paid overtime compensation at time and one-half for all hours worked in excess of 40 in any of these workweeks.

139.    For instance, during the week of Sunday, January 29, 2017 to Saturday, February 4, 2017, in his capacity as a Supervisor in the Cashier Unit., Plaintiff Bosis worked on site and was compensated for 31.5 hours; during the same period he was scheduled for 26.5 "on call" hours.  After taking into account physical work he was called in to perform "on call" and was paid for that week, Plaintiff Bosis should have been compensated for a total of 47.5 hours that week, including 7.5 hours of overtime compensation.

**J.    Plaintiffs and Class Plaintiffs Were Entitled to Be Paid for Hours Worked "On Call"**

140.    At all relevant times, Plaintiffs and Class Plaintiffs were non-exempt employees[1] entitled to payment of wages for all hours worked.  29 U.S.C. §206; R.I. Gen. Laws § 28-12-3 (requiring that employees be paid a minimum wage *per* hour).

141.    Both the FLSA and the RIPWA require employers to pay their non-exempt employees at a rate not less than one and one-half (1 ½) times their regular rate of pay for all hours worked in excess of forty (40) in any one (1) workweek.  29 U.S.C. § 207(a)(1); R.I.G.L. § 28-12-4.1.

---

[1] Any exemption from the payment of minimum wage or overtime are "narrowly construed against the employers seeking to assert their application," *Arnold v. Ben Kanowsky, Inc.* 361 U.S. 388,392, 80 S.Ct. 453, 456, 4 L. Ed. 2d 393 (1960), with the burden of proving the exemption placed "upon the employer."  *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896, 900 (3rd Cir. 1991); *Idaho Sheet Metal Works, Inc. v. Wirtz,* 383 U.S. 190, 206, 86 S.Ct. 737, 747, 15 L.Ed.2d 694 (1966).

142.     In interpreting the FLSA, the United States Supreme Court has long held that waiting time, standby time, and on-call time may be compensable under certain circumstances. *See, e.g., Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944).

143.     The relevant inquiry is whether an employee is "engaged to wait" or "wait[ing] to be engaged." *Skidmore,* 323 U.S. at 137, 65 S.Ct. 161.

144.     Plaintiff and Class Plaintiffs could not leave Defendant's campus while "on call" and thus all "on call" time is compensable under the FLSA. *See*  29 C.F.R. § 785.17 ("An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call'.")

145.     This time is worktime even if the employee is allowed to leave the premises or the job site during such periods of inactivity, particularly when whether or not the employee will be called into work is unpredictable, because the employee is unable to use the time effectively for his or her own purposes.  29 CFR §785.15.

146.     Further, while "on call" Plaintiffs and Class Plaintiffs spent substantial amounts of time not merely engaged to be waiting "on call" but actually working and must be compensated for the time spent working for Defendant while "on call."[2]

147.     Finally, the sheer amount of time spent working, coupled with the restrictions on the small amount of non-active working time Plaintiffs and Class Plaintiffs had while "on call" renders all "on call" time compensable.

---

[2]  *See e.g. Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 744 (6th Cir. 2000) ("We agree with Rutlin that, for pay period V, he should be compensated for the time spent answering the fifteen to twenty phone calls he received per night.  Answering these phone calls was not typical on-call time; rather, Rutlin was actually working, albeit from home. There is no question that the time Rutlin spent on those phone calls was primarily for the benefit of Prime Succession; therefore, Rutlin should be compensated for that time.")

148.    First, although Plaintiffs and Class Plaintiffs spent some time waiting for additional work to arrive, such a large portion of their time was devoted to that work, and when the work would arrive was so unpredictable that such time must be compensated under the FLSA.[3]

149.    Second, the amount of work, and the restrictions on the use of non-work time, rendered any "on call" time not spent actively working compensable because the time was primarily used to the benefit of the employer. *See  Boehm v. Kansas City Power & Light Co.*, 868 F.2d 1182, 1185 (10th Cir. 1989), quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 133 ("[T]he test for whether an employee's time constitutes working time is whether the "time is spent predominantly for the employer's benefit or for the employee's.")

150.    Courts determine whether time is spent predominantly for the employer's benefit or for the employee's by looking to several relevant factors, including: the number of calls, required response time, and ability to engage in personal pursuits while on call. *See  Pabst v. Oklahoma Gas & Electric Company*, 228 F.3d 1128, 1132 (10th Cir. 2000); *Armitage v. City of Emporia,* 982 F.2d 430, 432 (10th Cir.1992)*; Renfro v. City of Emporia,* 948 F.2d 1529, 1537–38 (10th Cir.1991).

151.    Of these factors, the "critical distinction" is the frequency of calls. *Pabst v. Oklahoma Gas & Electric Company*, 228 F.3d 1128, 1134 (10th Cir. 2000); *Gilligan v. City of Emporia,* 986 F.2d 410, 412 (10th Cir.1993).

---

[3] FLSA. *See* 29 CFR §785.15 ("A stenographer who reads a book while waiting for dictation, a messenger who works a crossword puzzle while awaiting assignments, fireman who plays checkers while waiting for alarms and a factory worker who talks to his fellow employees while waiting for machinery to be repaired are all working during their periods of inactivity.  The rule also applies to employees who work away from the plant.  For example, a repair man is working while he waits for his employer's customer to get the premises in readiness.  The time is worktime even though the employee is allowed to leave the premises or the job site during such periods of inactivity.  The periods during which these occur are unpredictable.  They are usually of short duration.  In either event the employee is unable to use the time effectively for his own purposes.  It belongs to and is controlled by the employer.  In all of these cases waiting is an integral part of the job. The employee is engaged to wait.")

152.    The added burden of always being on call, all day, every day is a factor weighing in favor of compensability.  *See Pabst v. Oklahoma Gas & Electric Company*, 228 F.3d 1128, 1134 (10th Cir. 2000); *Cross v. Arkansas Forestry Comm'n,* 938 F.2d 912, 916–17 (8th Cir.1991) (holding that on-call time is compensable under the FLSA because employees were required to continuously monitor transmissions and respond within thirty minutes, and because they were subject to on-call status twenty-four hours per day for every day of a work period).

153.    Other factors courts have considered relevant to a determination of the compensability of "on call" time include: "geographical restrictions on employees' movements, . . . use of a pager, . . . the ease with which on-call employees can trade on-call responsibilities, . . . and  . . . the existence and provisions of any agreement between the parties governing on-call work."  *Berry v. Cty. of Sonoma*, 763 F. Supp. 1055, 1058 (N.D. Cal. 1991)(footnotes omitted).

154.    In light of all the relevant facts and circumstances of their employment, Managers and Supervisors were "engaged to be waiting" while working "on call" and therefore entitled to compensation.

**K.      Failure to Pay Wages for all Hours Worked and/or Minimum Shift Pay**

155.    Throughout their employment with Defendant, Plaintiffs and Class Plaintiffs regularly worked hours "on call" for which they received no compensation.

156.    Despite the fact that Plaintiffs and Class Plaintiffs were and are non-exempt employees, Defendant failed or refused to pay Plaintiffs and Class Plaintiffs compensation for all hours worked in a given workweek as required by the FLSA and the RIPWA or minimum shift pay under the RIMWA when called into work to perform less than 3 hours work.

157.    Defendant willfully and repeatedly violated the FLSA as well as the RIPWA by failing to pay Plaintiffs and Class Plaintiffs the regular rate at which they were employed for each hour they worked, but no less than minimum wage[4] or minimum shift pay.

## L.   Failure to Pay Overtime Wages

158.    Throughout their employment with Defendant, Plaintiffs and Class Plaintiffs regularly worked more than forty (40) hours each workweek, including "on call" time.

159.    Despite the fact that Plaintiffs and Class Plaintiffs are non-exempt employees, Defendant failed or refused to pay Plaintiffs and Class Plaintiffs overtime pay on numerous workweeks as required by the FLSA and the RIPWA.

160.    Defendant willfully and repeatedly violated the FLSA as well as the RIPWA by employing Plaintiffs and Class Plaintiffs for more than forty (40) hours per workweek without compensating them at a rate not less than one and one-half (1 ½) times the regular rate at which they were employed.

## M.    Work Suffered or Permitted

161.    Defendant is liable for the payment of compensation for all hours worked, including "on call" hours, and overtime wages for all hours over forty (40) that Plaintiffs and Class Plaintiffs were "suffered or permitted to work" in any one workweek—regardless of

---

[4]    29 C.F.R. § 778.113(a)(when salaried employee has fixed workweek less that forty (40) hours, *she is entitled to her hourly equivalent for all additional hours worked up until forty hours* (not minimum wage) and time and one half for every hour worked above hour forty); *see Sobczak v. AWL Indus., Inc.,* 540 F. Supp. 2d 354, 359, 360 (E.D.N.Y. 2007) (FLSA can only increase, not decrease, amounts to which employees are contractually entitled; "the Supreme Court has determined that it is 'the hourly rate *actually paid* the employee for the normal, non-overtime workweek for which he is employed [that is relevant].' " (quoting *Walling v. Youngerman-Reynolds Hardwood Co.,* 325 U.S. 419, 424 (1945)); *see also,* 29 U.S.C.A. § 218  ("No provision of this chapter shall justify any employer in reducing a wage paid by him which is in excess of the applicable minimum wage under this chapter"); 29 C.F.R. § 778.5 ("Where a higher minimum wage than that set in the Fair Labor Standards Act is applicable to an employee . . ., the regular rate of the employee, as the term is used in the Fair Labor Standards Act, cannot be lower than such applicable minimum, for the words "regular rate at which he is employed" as used in section 7 must be construed to mean the regular rate at which he is lawfully employed.").

whether the work was requested, authorized or needed—whenever Defendant knew or had constructive knowledge that the work was being performed.[5]

162.    Defendant knew or had reason to believe that Plaintiffs and Class Plaintiffs were performing work and overtime work for which they were not being compensated.

163.    Moreover, Defendant knew or had reason to believe that Plaintiffs and Class Plaintiffs were working in excess of forty (40) hours per week on a regular basis.

164.    Accordingly, Defendant had constructive, if not actual, knowledge that Plaintiffs and Class Plaintiffs regularly performed work and overtime work for which they were not compensated.[6]

165.    Nevertheless, Defendant failed or refused to pay Plaintiffs and Class Plaintiffs the compensation to which Plaintiffs and Class Plaintiffs were legally entitled for all hours and overtime hours worked.[7]

## VI.    Claims for Relief

166.    Plaintiffs and Class Plaintiffs incorporate the allegations in ¶¶1 through 165 above in each of the counts set forth below.

---

[5] As long as the employer knows or has reason to believe that its employee is continuing to work, that time is "work time," and the employee is entitled to the payment of wages from the employer for said time. *See* 29 C.F.R. § 785.11.

[6] An employer is said to have "constructive knowledge" of its employee's overtime work when it has reason to believe that its employee is working beyond his shift. *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306 (11th Cir. 2007).

[7] Once an employer knows or has reason to know that an employee is working overtime, *it cannot deny compensation even where the employee fails to claim overtime hours or the work was not requested. Holzapfel v. Town of Newburgh, N.Y.,* 145 F.3d 516 (2d Cir. 1998); *Johnson v. RGIS Inventory Specialists*, 554 F. Supp. 2d 693 (E.D. Tex. 2007).

## COUNT ONE
### *Fair Labor Standards Act,*
### *U.S.C. § 201, et seq.*

167.     Defendant, by its acts and/or omissions, including, but not limited to, those described herein, violated the FLSA by failing to pay wages and overtime wages as provided therein, thereby causing Plaintiffs and Class Plaintiffs to suffer damages as aforesaid, for which they are entitled to relief pursuant to 29 U.S.C. § 216(b).

## COUNT TWO
### *Rhode Island Payment of Wages Act,*
### *R.I. Gen. Laws § 28-12-1, et seq., and*
### *R.I. Gen. Laws § 28-14-1, et seq.*

168.     Defendant, by its acts and/or omissions, including, but not limited to, those described herein, violated the RIPWA by failing to pay wages and  overtime wages as provided therein, thereby causing Plaintiffs and Class Plaintiffs to suffer damages as aforesaid, for which they are entitled to relief pursuant to R.I. Gen. Laws § 28-14-19.2.

## VI.     Prayers for Relief

**WHEREFORE**, Plaintiffs pray that this Honorable Court grant the following relief:

1.     A declaratory judgment declaring that the acts and/or omissions of Defendant, including, but not limited to those complained of herein, are in violation of the FLSA and the RIPWA.

2.     An injunction directing Defendant to take such affirmative action as is necessary to refrain from such conduct as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated.

3.     An award of unpaid wages and overtime wages.

4.     An award of compensatory damages.

5.     An award of punitive damages.

6.      An award of liquidated damages pursuant to 29 U.S.C. § 216(b).

7.      An award of liquidated damages in an amount of two times the amount of wages and and/or benefits owed pursuant to R.I. Gen. Laws § 28-14-19.2 and § 28-14-20.

8.      An award of reasonable attorney's fees and costs of litigation pursuant to 29 U.S.C. § 216(b).

9.      An award of reasonable attorney's fees and costs pursuant to R.I. Gen. Laws §§ 28-14-19.2 and § 28-14-20.

10.      An award of other appropriate equitable relief pursuant to 29 U.S.C. § 216(b).

11.      An award of other appropriate equitable relief or penalties pursuant to R.I. Gen. Laws § 28-14-19.2.

12.      An award of such other and further relief as this Honorable Court deems just and proper.

## VII.   **Demand for Jury Trial**

Plaintiffs hereby demand a trial by jury on all counts so triable.

## VIII.   **Designation of Trial Counsel**

Plaintiffs hereby designate Richard A Sinapi, Esquire, as trial counsel.


                              Plaintiffs and Class Plaintiffs
                              By their attorneys,
                              **SINAPI LAW ASSOCIATES, LTD.**

**Dated: January 24, 2019**          /s/ **Richard A. Sinapi**, Esq.
                              **Richard A. Sinapi, Esq. (#2977)**
                              2374 Post Road Suite 201
                              Warwick, RI 02886
                              Phone:  (401) 739-9690; FAX:  (401) 739-9490
                              Email: ras@sinapilaw.com